UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DIANNE NUNEZ, )
Plaintiff )
v. ) Case No. 2:04 cv 537
JO ANNE B. BARNHART, )
COMMISSIONER OF SOCIAL SECURITY )
Defendant )

ORDER AND OPINION

This matter is before the court on the Motion for Summary Judgment filed by the plaintiff, Dianne Nunez, on May 16, 2005. For the reasons set forth below, this motion is **DENIED**.

Background

The plaintiff, Dianne B. Nunez, applied for Disability Insurance Benefits and Supplemental Security Income ("SSI") on August 13, 2001, alleging a disability onset date of April 13, 2001. (Tr. 104, 230) The claim was denied initially on December 4, 2001 and upon reconsideration on April 9, 2002. (Tr. 74-75) Nunez requested a hearing before an Administrative Law Judge ("ALJ") on June 3, 2002, and a hearing was held before ALJ William Wilkin on December 23, 2002. (Tr. 32, 85) Subsequent to the hearing in which Nunez and Vocational Expert ("VE") Leonard Fisher testified, the ALJ denied Nunez's application by written decision dated March 6, 2003. (Tr. 26-31) Following a denial of her request for review by the Appeals Council on April 12, 2002, Nunez filed a complaint in this court on January 26, 2005. (Tr. 82)

Nunez was born on November 23, 1952 and was 50 years old at the time of the ALJ hearing. She is 4'11" tall and weights 226 pounds. (Tr. 36) She does not drink or smoke. (Tr. 53) She has no children, and she lives by herself in a second-floor apartment in East Chicago, Indiana. (Tr. 36-37) Nunez has a high school GED and worked from 1985 until April 2001 as a secretary at a state mental health agency where she performed paperwork, filing, typing, made client appointments, and answered seven to nine phone lines. (Tr. 38) She spent the majority of her day in a seated position. (Tr. 40, 61, 117) The heaviest weight she lifted in this job was 10 pounds, and she frequently lifted less than 10 pounds. (Tr. 117) On April 13, 2001, she stopped working due to osteoporosis with chronic pain, tendonitis with chronic pain, arthritis, and diabetes mellitus. (Tr. 116)

Dr. Ricardo Hood has been Nunez's treating physician since February 24, 1998. (Tr. 183-216) On November 30, 1998, Nunez went to the emergency room of St. Catherine Hospital complaining of back pain. (Tr. 149) The majority of dates have been omitted from the photocopied record, but shortly thereafter Nunez sought treatment from Dr. Hood for tightness, pain, and cramps in her lower back which she said had lasted for two weeks. Dr. Hood found minor tenderness to her lower back and paravertebral area, and he diagnosed muscle strain to the lower back. (Tr. 209) Also during 1998, Nunez visited Dr. Hood for pain in her wrist after hurting it stapling, and pain and stiffness in the proximal ulna region of her forearms that increased with writing and typing and

which had been occurring for two years. (Tr. 208) Dr. Hood found minor tenderness in both forearms and diagnosed tendonitis with an acute sprained wrist. (Tr. 208)

On February 1, 1999, Nunez returned to St. Catherine Hospital complaining of lumbar back pain radiating to her stomach. (Tr. 156) Upon evaluation, Dr. Issac Plamoottil found paravertebral tenderness with spasm and diagnosed lumbosacral strain. (Tr. 157) An x-ray taken the same day showed mild osteoarthritic changes to the lumbar spine, and the emergency room notes state that Nunez ambulated with difficulty. (Tr. 154-56). Later in February, Dr. Hood noted that Nunez's hip pain was improving with Naprosyn. (Tr. 205) Also in 1999, Dr. Hood diagnosed Nunez with neck sprain and ordered a cervical x-ray after she complained of pain in her right shoulder following a motor vehicle accident. (Tr. 204) Although the cervical x-rays are not in the record, Dr. Hood later noted that they reflected osteoarthritis. (Tr. 203) Subsequently, Nunez complained of pain across the middle of her back lasting for one month and was not relieved by the Naprosyn. Dr. Hood diagnosed a new onset of back pain. (Tr. 202) On September 19, 1999, Nunez went to the emergency room at St. Catherine's for a third time complaining of back pain across her shoulder blades and ribs. (Tr. 159-60)

On September 30, 2000, Nunez visited the emergency room a fourth time for pain radiating from her left hip down to the left knee.(Tr. 163-64) Subsequent notes from Dr. Hood state that Nunez described the pain as severe and lasting for part of the

month and indicate that previous prescriptions for Celebrex had not given relief, whereas Motrin and Toradol gave minor relief. Upon examination, Dr. Hood found a full range of motion in Nunez's back, tenderness on the right side of the S.I. joint, and tenderness to another illegible area that radiated to the back of her thigh. He diagnosed arthritis and sciatica and ordered an x-ray of Nunez's hip. (Tr. 199) An x-ray taken October 19, 2000 showed "mild degenerative arthritic changes and osteoporosis of the left hip with osteophyte formation and mild narrowing of the joint space inferiorly. Bone island of left femoral neck." (Tr. 166) At the end of 2000, Nunez still reported severe pain in her back radiating to her legs, which Dr. Hood diagnosed as chronic pain and osteoporosis. (Tr. 198)

In early 2001, Nunez told Dr. Hood that she had pain in her hands, shoulders, feet, toes, calves, and back which prevented her from laying on her left side and made her secretarial job difficult to perform. She further described multiple falls in the past due to her knees. Examination showed tenderness in Nunez's shoulders, upper back, upper extremities, hands, and knees with palpitation. Dr. Hood diagnosed osteoporosis, osteoarthritis, tendinitis, diabetes mellitus, and chest pain. (Tr. 194) A bone density scan ordered by Dr. Hood in April 2000 showed that the density of Nunez's lumbar spine measured at 86% of adult peak and that her left hip measured at 79% of adult peak, both of which met the world health criteria for osteopenia. (Tr. 217) In May 2001, Nunez complained to Dr. Hood that her

bones were hurting and that she was having increased difficulty walking, sitting, and climbing stairs and that she was experiencing numbness in her toes and heels, and tingling in her fingers. (Tr. 194) Dr. Hood's examination showed generalized muscle tenderness in Nunez's back, neck, and extremities, tenderness in the ball and heel of her feet, tenderness to the left knee and thigh, and crepitation to the ankles and knees with range of motion. (Tr. 193)

The remainder of Dr. Hood's notes between 2001 and March 2002 show ongoing complaints of pain in multiple areas of Nunez's body including the back of her head, feet, heels, hips, legs, and knees. (Tr. 183-92) On June 29, 2001, Dr. Hood noted that Nunez continued to have significant pain in her hands, feet, and hips, and he diagnosed her with diabetic neuropathy. (Tr. 190) On July 25, 2001, Dr. Hood noted that Nunez failed to take her medication with her on a three week trip to Fort Wayne, Indiana. (Tr. 189) On November 2, 2001, Nunez stated that she had tenderness in her left hip when walking which increased with sitting 60 to 90 minutes. (Tr. 187) Finally, on Dec. 4, 2002, Dr. Hood told Nunez that she could exercise at the gym. (Tr. 186)

On November 15, 2001, Dr. Kanayo Odeluga examined Nunez for the Disability Determination Bureau ("DDB"). Nunez described the same symptomology to Dr. Odeluga as she had to Dr. Hood. (Tr. 167) Upon examination, Dr. Odeluga found that Nunez did not have spinous or paraspinal tenderness, had a full range of motion, and had negative straight leg tests. (Tr. 171) He further noted that

she had "moderate tenderness over both lateral epicondyles but negative provocative tests," a full range of motion in each joint, and 5/5 strength in her upper extremities. Examination of her lower extremities showed "tenderness over the lateral aspects of both hips" and a positive Patrick's test on both hips, but a full range of motion and strength. (Tr. 171) Dr. Odeluga did not observe Nunez to have any difficulty getting on and off the exam table, tandem walking, walking on her toes or heels, or hopping, but she did have mild difficulty squatting. (Tr. 171) Based on his examination and the hip x-ray from October 2000, Dr. Odeluga concluded that Nunez had "chronic bilateral hip pain due to degenerative joint disease, osteoporosis, diabetes mellitus, mild right hearing impairment, hypercholesterolemia, bilateral lateral epicondylitis, elevated blood pressure, allergic rhinitis, [and] chronic sinusitis." (Tr. 172)

On November 29, 2001, the DDB requested a complete Residual Functional Capacity ("RFC") for Nunez. (Tr. 174, 225) That day, Dr. Steven Roush completed an RFC form in which he concluded that Nunez could occasionally lift 50 pounds, frequently lift 25 pounds, stand/walk or sit for up to six hours in an eight hour day, and had an unlimited ability to push/pull. Dr. Roush also noted Nunez had problems with obesity, hip pain, and a minimally reduced range of motion, but she had a normal gait, strength, and mobility. (Tr. 176) He did not complete the rest of the form, except to say that Nunez was credible, although the severity of her complaints was not supported. (Tr. 180)

On March 8, 2002, Nunez supplied an eight page response, which she said took a week to write, in answer to a pain questionnaire. She stated that she could not walk or move around after approximately one hour, recently began using a cane, could not walk more than one or two blocks, and had difficulty climbing the stairs up to her apartment. (Tr. 138) She further said that she did not have a social life and that she relied on family and friends to grocery shop and to assist in cleaning her apartment. (Tr. 138-40) She also described constant pain throughout her body that made it difficult for her to bend, squat, stoop, reach, stand for long periods, or sit for more than one hour before needing to lie down. (Tr. 141, 144)

In March 2002, the DDB reviewer, Linda Walker, again requested medical review of Nunez's claim, noting that Nunez had described severe limitations in response to the pain questionnaire, but that x-rays from February 1999 and October 2000, as well as the April 2001 bone density test, did not show significant changes. In addition, she noted that Nunez had poor control of her diabetes. (Tr. 225) Finally, Walker commented that Dr. Hood described diabetic neuropathy but that Dr. Odeluga's November evaluation did not document such a condition and was essentially normal. (Tr. 225)

On April 9, 2002, Dr. Irving Zitman reviewed Nunez's medical records in response to Walker's request. (Tr. 227) Dr. Zitman noted that Dr. Hood appeared to attribute Nunez's pain to either osteoporosis, osteoarthritis, or diabetic neuropathy. (Tr. 227)

He concluded that Dr. Hood's notes since April 13, 2001, when Nunez stopped working, did not show that Nunez's condition was worsening, although her diabetes was worse. However, he concluded that objective findings were minimal on her condition and that osteoporosis without fractures should not be as painful as Nunez suggested. Dr. Zitman concluded that non-compliance with Nunez's diabetes and weight control were contributory to her condition. (Tr. 227) He also signed the RFC previously completed by Dr. Roush. (Tr. 182)

As of June 3, 2002, Nunez was taking Therapeutic Plus Vitamins, Amitriplyline, Prempro, Propox-ApAp, Starlix, Calcium, Actos, Fosamax, Metformin, Naproxen, and Lescol to treat diabetes, arthritis, and osteoporosis. (Tr. 228)

At the ALJ hearing on December 23, 2002, Nunez testified that she began to have problems with her left hip when sitting in her job in 2001 and that medication did not reduce the pain. (Tr. 42-43) She also described the numbness and tingling in her toes and heels, pain in her arms, fingers, shoulders, and knees, and her diabetes. (Tr. 43-46) Nunez described her day as trying to clean her apartment, performing limited cooking, sitting, and laying down. She said that the farthest she had walked in the past few years was the three blocks she walked to attend the ALJ hearing, estimated that she could stand for approximately 10 minutes and sit for about 30 minutes before she was in severe pain, and stated that she relied on a cane. (Tr. 51-52, 55, 60) Nunez described pain in her right hand and arm when she squeezed

her fist or placed her arms out parallel to the floor, and she further testified that she could carry and lift no more than three pounds. (Tr. 51-52, 54-55, 57) She said that she had wanted to exercise to relieve her bone pain, as reflected in Dr. Hood's 2001 notation, but that she had not been able to do it. (Tr. 65)

Following Nunez's testimony, the ALJ asked VE Fisher to describe the vocational capacity of a 50 year old claimant with Nunez's past education and experience who was limited to a medium work function in a job that required low degrees of concentration, allowed for the ability to change position at will, and did not require repetitive lifting above shoulder level. (Tr. 69) In response to this hypothetical, the VE stated that Nunez could perform 2,000 packaging, 5,500 kitchen worker, over 5,000 inspector, and 9,150 dining room attendant positions. (Tr. 69) For the same hypothetical with a light work restriction, VE Fisher stated that Nunez could do 15,881 assembly, 39,052 inspector, 9,000 packaging, 26,000 cashier, and 36,000 food preparation jobs. (Tr. 70) For a sedentary restriction, Nunez could perform 800-4,000 systems security monitor, 600-800 addresser, and 500 packaging jobs.(Tr. 70)

In his March 6, 2003 decision denying benefits, ALJ Wilkin summarized the medical records from Nunez's February 1, 1999 and September 19, 1999 visits to the emergency room and Dr. Odeluga's examination for the DDB on November 15, 2001. He also acknowledged Nunez's complaints to Dr. Hood regarding pain and tenderness to the shoulders, upper back, upper extremities, and knees,

that the April 2001 bone density scan showed osteoporosis, and that Nunez's diabetes was characterized as "uncontrolled" for a period of time. However, ALJ Wilkin also concluded that "the claimant admitted to periodic noncompliance with her dietary guidelines, and her blood sugar levels reflect that noncompliance." (Tr. 28) Based on this evidence, the ALJ concluded that Nunez's diabetes mellitus, osteoporosis, and osteoarthritis were "severe" at Step Two of the disability analysis. After determining that Nunez did not meet or equal a Listing at Step Three, the ALJ found at Step Four that Nunez had an RFC to perform a wide range of light work. Specifically, he concluded that she "can lift/carry 10 pounds frequently and 20 pounds occasionally, and can sit, stand and/or walk 6 hours each during an 8 hour day." However, she must be allowed to change positions at will, and she cannot repetitively stoop, bend, crawl or climb. . . ." He also determined that pain restricted Nunez to jobs requiring a low degree of concentration. (Tr. 29-30)

In reaching this RFC, the ALJ concluded that Nunez was only partially credible. (Tr. 29) ALJ Wilkin considered the bone density test results and Dr. Odeluga's examination to adopt Dr. Zitman's opinion that "[a]bsent any indication of fracture or other substantial abnormalities, the claimant's pain should not be as severe as she contends." (Tr. 29) He also noted that aside from Nunez's own complaints, there were no significant findings regarding Nunez's upper extremity complaints and that he could not credit complaints relating to Nunez's diabetes that were

directly caused by noncompliance. (Tr. 29) However, he declined to adopt Dr. Roush's RFC, which permitted Nunez to perform a range of medium work. (Tr. 30) Rather, ALJ Wilkin concluded that Nunez could perform 15,881 assembly, 39,052 inspector, 9,000 packaging, 26,000 cashier, and 36,000 food preparation jobs, consistent with VE Fisher's hypothetical for light work. (Tr. 70)

Discussion

The standard for judicial review of an ALJís finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. ß405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Schmidt v. Barnhart***, 395 F.3d 737, 744 (7th Cir. 2005); ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* ***Consolidated Edison Company v. NLRB***, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* ***Jens v. Barnhart***, 347 F.3d 209, 212 (7th Cir. 2003); ***Sims v. Barnhart***, 309 F.3d 424, 428 (7th Cir. 2002). An ALJís decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. ***Rice v. Barnhart***, 384 F.3d 363, 368-369 (7th Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002). However, "the

decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez***, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. ß423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. ß404.1520, ß416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. ß404.1520(b), ß416.920(b). If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. ß404.1520(c), ß416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. ß401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabili-

ties, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. ß404.1520(e), ß416.920(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. ß423(d)(2); 20 C.F.R. ß404.1520(f), ß416.920(f).

Nunez's first argument in support of remand is that the ALJ failed to comply with Social Security Ruling 00-4p when he did not ask VE Fisher whether the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT"). SSR 00-4p places an affirmative duty on the ALJ to

> [i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the Department of Labor, and [e]xplain in the determination or decision how any conflict that has been identified was resolved.
>
> SSR 00-4p, at *1

However, the Seventh Circuit interprets this Ruling to "[require] an explanation only if the discrepancy was 'identified' - that

is, if the claimant (or the ALJ on his behalf) noticed the conflict and asked for substantiation." ***Donahue v. Barnhart***, 279 F.3d 441, 446-47 (7th Cir. 2002). *See also* ***Prochaska v. Barnhart***, ___ F.Supp.2d ___, 2005 WL 901202, at *14 (W.D. Wis. Apr. 19, 2005) (holding that the ALJ's duty to inquire into discrepancies "arises only if the claimant (or her lawyer) explores a discrepancy."). Otherwise, "an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the *Dictionary's*." ***Donahue***, 279 F.3d at 446. Failure by the plaintiff or her counsel to raise the issue at the ALJ hearing constitutes waiver. *See* ***Buchholtz v. Barnhart***, 98 Fed. Appx. 540, 546-47 (7th Cir. 2005); ***Donahue***, 279 F.3d at 447 ("Raising a discrepancy only after the hearing, as Donahue's lawyer did, is too late."); ***Prochaska***, 2005 WL 901202, at *14.

Here, Nunez was represented by Nadiyah Tolbert, a paralegal from Indiana Legal Services, Inc. at the ALJ hearing. Tolbert did not challenge the VE's testimony during the hearing, and so the plaintiff's attempts to do so on appeal from the ALJ's decision are untimely. *See* ***Donahue***, 279 F.3d at 447. While Tolbert's non-attorney status may have impacted the ALJ's duty towards Nunez, any arguments to this effect are waived because the plaintiff has not made them. *See, e.g.,* ***Koschnitzke v Barnhart***, 293 F. Supp.2d 943, 947-48 (E.D. Wis. 2003).

Next, the plaintiff briefly argues, without legal support, that the ALJ's finding that Nunez could "sit, stand and/or walk 6 hours each during an 8 hour day," does not comply with the law

because the ALJ did not set forth Nunez's maximum limitations on these activities individually or in combination. *See* Opening Brief, pg. 12. She also argues that this finding is factually inconsistent with the ALJ's determination that Nunez must change positions at will. First, the Seventh Circuit recently stated:

> SSR 96-8p requires separate assessments of each strength but recognizes that a final assessment may ultimately consider these activities in combination, e.g., a sit/stand option. SSR 96-8p at 5. The ALJ adhered to this ruling when adopting for its RFC determination the testimony . . . that [the plaintiff] was capable of standing or walking for two hours and sitting for six hours and added a sit/stand option every twenty to twenty-five minutes. As the Commissioner points out, nothing in SR-96-8p required the ALJ to provide a more specific RFC.
>
> ***Buchholtz***, 98 Fed. Appx. at 547

The plaintiff's attempt to heighten the ALJ's obligation here is not well-taken. Second, Nunez's factual argument makes no sense on a practical level. The ALJ incorporated Nunez's need to change position into his RFC determination and the hypotheticals he posed to VE Fisher. (Tr. 29-30, 69) In addition, the court cannot see how a job allowing the claimant to sit, stand, and/or walk for six hours each prevents the claimant from changing position at will.

Nunez's third argument, also legally unsupported and more unclear than her first two theories, appears to be that the ALJ failed to state Nunez's need to alternate between standing, walking, and sitting with specificity, in contravention to SSR 96-9p. *See* Opening brief, pp. 12-13. The court notes that SSR

96-9p applies only to claimants with the ability to perform less than a full range of sedentary work. Here, the ALJ found that Nunez could perform light work. Moreover, the plaintiff's reliance on ***Peterson v. Chater***, 96 F.3d 1015, 1016 (7th Cir. 1996) in her reply brief is misplaced. In ***Peterson***, the Seventh Circuit found that the ALJ's conclusion that Peterson could perform sedentary work was not consistent with another finding that Peterson could not perform "prolonged" sitting, standing, or walking. *See* 96 F.3d at 1016. Here, ALJ Wilkin made neither of these findings. The plaintiff's claim that ALJ Wilkin's findings are inconsistent because she cannot stay in one position for any length of time simply adopts the plaintiff's version of her abilities, rather than the ALJ's determination. The plaintiff's attempt to challenge the ALJ's credibility determination for the first time in her reply brief is untimely, and thus waived. *See* ***Richardson v. United States***, 379 F.3d 485, 488 n.1 (7th Cir. 2004).

Nunez next contends that the ALJ failed to consider the impact of her obesity on her ability to work. Under SSR 02-1p, "excessive weight alone does not evidence impaired functionality." *See* ***Prochaska***, 2005 WL 901202, at *10; *Accord* ***Barrett v. Barnhart***, 355 F.3d 1065, 1068 (7th Cir. 2004) (contrasting hypo-thyroidism with obesity due to poor diet)("[I]f an applicant's obesity is in fact remediable, then it is no more a basis for an award of benefits than any other remediable condition would be."). The facts of this case are substantially the same as those before the

***Prochaska*** court. In ***Prochaska***, neither the plaintiff, her treating physician, nor the consultive examiner suggested that her weight was attributed to the other health problems she was experiencing. *See* 2005 WL 901202, at *10. Here, Nunez has not been diagnosed with hypothyroidism or another medical condition from which obesity typically arises. *See* ***Barrett***, 355 F.3d at 1068. Nunez also has not supplied, nor can the court immediately find, any references in the record to treatment specifically for obesity or physician opinions on how obesity impacted her other physical ailments. Nunez herself did not complain that her weight exacerbated her condition. Without this link, there is no basis to remand for a specific finding on obesity. *See* ***Prochaska***, 2005 WL 901202, at *10. In any event, the record shows that ALJ Wilkin acknowledged that Nunez was obese in reaching his disability determination. (Tr. 28)

The record is even more sparse on the issue of depression. Nunez did not claim disability due to depression, did not reference the condition in any of her filings to the DDB, has not sought mental health treatment, and did not claim to suffer from depression at the ALJ hearing. The only reference in the record to depression is a diagnosis of "mild depression" in 2001, for which Dr. Hood prescribed Elavil. (Tr. 191) In light of the plaintiff's burden to establish a mental impairment at Step One and her failure to assert a disability on the basis of depression until this appeal, it was reasonable for the ALJ not to conduct

further investigation into Nunez's alleged depression. *See* ***Howell v. Sullivan***, 950 F.2d 343, 348 (7th Cir. 1991).

The plaintiff's argument that the ALJ should have obtained an additional x-ray of her left knee also fails. Under the Social Security regulations, the ALJ must obtain additional information only when the record is inadequate to reach a disability determination. *See* 20 C.F.R. ßß404.1512(e); 404.1517. For example, the ALJ will violate his duty to develop a full and fair record if he concludes that a degenerative condition has not become disabled on the basis of outdated x-rays. *See* ***Smith v. Apfel***, 231 F.3d 433, 437-38 (7th Cir. 2000). However, in general, "[h]ow much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment." ***Kendrick v. Shalala***, 998 F.2d 455, 458 (7th Cir. 1993).

Nunez argues that an x-ray is necessary to create "objective evidence" of her complaints of pain. *See* Opening Brief, pg. 14. First, the ALJ did not reject Nunez's allegations of painful knees. Rather, he declined to believe the *severity* of her complaints and modified her RFC on the basis of the severity the ALJ found to be supported by the record. (Tr. 29-30) Second, the evidence on which the plaintiff relies to support the need for further x-rays is not as applicable as she suggests. The hospital records from September 2000 show that Nunez had pain radiating down to her left knee that was caused at least in part by an abscess on her left thigh. (Tr. 163-64) The hospital physicians did not deem knee x-rays necessary, nor did Dr. Hood upon subse-

quently finding that Nunez had crepitation in her knee with range of motion exercises. (Tr. 163, 193) Thus, the facts of this case are distinguishable from those of ***Smith*** in which the claimant's physicians deemed x-rays necessary diagnostic tests from the start. In sum, the plaintiff has not shown how an x-ray would lead to a different result in this case. *See* ***Nelson v. Apfel***, 131 F.3d 1228, 1235 (7th Cir. 1997).

Finally, the plaintiff's argument that the ALJ needed to recontact Dr. Hood to obtain an RFC from a treating physician is without merit. The regulations clearly state that the absence of "a medical source statement about what [the claimant] can still do despite [her] impairment(s) . . . will not make the [treating physician's] report incomplete." 20 C.F.R. ß404.1513(b)(6). The regulations further contemplate that an RFC will be provided by a state agency consultant. 20 C.F.R. ß404.1546. While Dr. Roush did not have access to many of Nunez's medical records when he completed an RFC on November 29, 2001, Dr. Zitman endorsed Dr. Roush's RFC after considering the full record. (Tr. 182, 227) While more information always can be obtained, the RFC provided by Drs. Roush and Zitman was sufficient here. *See* ***Kendrick*** 998 F.2d at 456-57.

---

For the foregoing reasons, the Motion for Summary Judgment filed by the plaintiff, Dianne Nunez, on May 16, 2005 is **DENIED.**

ENTERED this 2nd day of March, 2006

s/ ANDREW P. RODOVICH
United States Magistrate Judge